UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOHN S NOBLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-01307-TWP-MJD |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

John Noble ("Plaintiff") requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be **REVERSED** and **REMANDED.**

**Procedural History and Background**

Plaintiff filed an application for DIB on July 22, 2011, alleging an onset of disability on November 13, 2007. [R. at 18.] He had work experience as an industrial truck operator and vehicle parts sub-assembler, [R. at 34], and he alleged he was disabled because of depression, anxiety, and degenerative disc disease. [R. at 20.][1]

The Social Security Administration ("SSA") denied Plaintiff's claim initially on September 25, 2011 and upon reconsideration on November 22, 2011. [R. at 18] Plaintiff requested a hearing, and on February 27, 2013, Plaintiff appeared before Administrative Law

---

[1] Plaintiff recited the relevant factual and medical background in more detail in his opening brief. [*See* Dkt. 14.] The Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 17.] Because these facts involve Plaintiff's confidential and otherwise sensitive medical information, the Court will incorporate by reference the factual background in the parties' briefs and will articulate only specific facts as needed herein.

Judge ("ALJ") Mark Ziercher. [*Id.*] Also present were Plaintiff's attorney, Melissa Davidson, and vocational expert Michael Blankenship. [R. at 42.] The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date through the date of his April 24, 2013 decision. [R. at 36.] The Appeals Council denied Plaintiff's request for review on June 6, 2014, thereby rendering the ALJ's decision final. [R. at 5.] Plaintiff then filed his complaint with this Court on August 7, 2014.

## **Applicable Standard**

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.[2] Disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that his physical or mental limitations prevent him from doing not only his previous work, but any other kind of gainful employment which exists in the national economy, considering his age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or Supplemental Security Income. However, separate, parallel statutes and regulations exist for Disability Insurance Benefits and Supplemental Security Income claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

2

three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, he is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate his analysis of the evidence in his decision; while he "is not required to address every piece of evidence or testimony," he must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to [his] conclusion." *Dixon*, 270 F.3d at 1176.

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Act through March 31, 2013. [R. at 20.] At step one of the sequential evaluation process, the ALJ

determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 13, 2007. [*Id.*]

At step two, the ALJ determined that Plaintiff had the following "severe" impairments: major depressive disorder; generalized anxiety disorder; and lumbar degenerative disc disease. [*Id.*] At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listed impairment. [R. at 23-24.] The ALJ considered and rejected Listing 1.04 (Disorders of the Spine), Listing 12.04 (Affective Disorders), and Listing 12.06 (Anxiety-Related Disorders). [R. at 24.]

In considering Listings 12.04 and 12.06, the ALJ employed the SSA's special technique for evaluating mental impairments. [R. at 24-26.] He first assessed the "Paragraph B" criteria, and he determined that Plaintiff had "little" limitation on his ability to perform activities of daily living; had "some" limitations on his social function; had "moderate" difficulties in maintaining concentration, persistence, or pace; and had no episodes of decompensation of an extended duration. [R. at 25-26.] He thus concluded that the Paragraph B criteria were not satisfied. [R. at 26.] The ALJ then considered the "Paragraph C" criteria, and found that "the medical evidence [did] not support the presence" of the criteria for either Listing 12.04 or Listing 12.06. [R. at 26.]

After step three but before step four, the ALJ analyzed Plaintiff's residual functional capacity ("RFC"). He concluded that Plaintiff:

> had the residual functional capacity to perform work at the sedentary exertional level. He can stand and/or walk for up to 30 minutes uninterrupted for up to a total of 6 hours in an 8-hour workday, and can sit for up to 30 minutes uninterrupted for up to a total of 6 hours in an 8-hour workday. He can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl. He can have frequent exposure to moving mechanical parts and high, exposed places (as defined by the Selected Characteristics of Occupations). He can understand, remember, and perform simple work tasks at GED Reasoning Level 02 (as defined in the Selected Characteristics of Occupations) and can perform

productive work tasks for up to an average of 98 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks. He can have frequent contact with the general public. He can perform work in which independent goal setting or planning happens no more than frequently.

[R. at 26-27.] The ALJ concluded at step four that this RFC did not allow Plaintiff to perform his past relevant work as an industrial truck operator or vehicle parts assembler. [R. at 34.] At step five, the ALJ determined that a person with Plaintiff's age, education, work experience, and RFC could perform jobs such as telephone quote clerk, table worker, and cutter and paster. [R. at 35.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled. [R. at 35-36.]

## Discussion

Plaintiff identifies three alleged errors in the ALJ's opinion. He primarily contends that the ALJ erred by refusing to credit reports about Plaintiff's mental limitations because the reports were purportedly not supported by objective medical evidence. [Dkt. 14 at 7.] He also contends that the ALJ erred by improperly dismissing the opinions of Plaintiff's nurse practitioner and licensed clinical social worker. [*Id.*] He finally contends that the ALJ should have obtained an updated opinion from a medical expert to assess whether Plaintiff's impairments met or medically equaled a Listed impairment. [*Id.*]

### A. Evaluation of Mental Limitations

The record in this case contains numerous statements indicating that Plaintiff's mental impairments limited his ability to work. First, Plaintiff himself testified that even with prescription medication and therapy, his depression caused him to spend many days in bed, [R. at 56], and his anxiety interfered with his ability to perform daily activities such as leaving his home or going shopping. [R. at 58-59, 71.] He also rated his depression at a "9" on a scale of one

5

to ten and his anxiety at a "10" on a scale of one to ten.[3] [R. at 52-53, 57.] Second, third party functional reports from Plaintiff's mother and friend indicated that Plaintiff had difficulty understanding instructions, concentrating, completing tasks, and interacting with other people. [R. at 184-86; R. at 209-10.] Finally, consultative examiner Dr. Nicole Poupeney wrote that Plaintiff's "[d]epression and anxiety would likely prevent him from keeping a regular work schedule or seeking employment opportunities." [R. at 279.] She added that "[d]ue to his depressed mood and anxiety," Plaintiff "would likely have difficulty in maintaining concentration" and "may struggle in employment that requires frequent interactions with people that he is not familiar with." [*Id.*]

The ALJ discounted each of these opinions. He found Plaintiff's statements and the third party reports only "partially credible," [R. at 30-31], and he gave "little weight" to Dr. Poupeney's conclusions. [R. at 31.] As explained below, the ALJ erred in doing so.

**1. Plaintiff's Credibility**

When evaluating a claimant's credibility, an ALJ must consider factors such as a claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the effects of medication; the effects of treatment other than medication; and any measures other than medication or treatment that the claimant has used to alleviate his symptoms. 20 C.F.R. § 404.1529(c). The Court's review of this evaluation is deferential. "An ALJ is in the best position to determine a witness's truthfulness and forthrightness; thus, this court will not overturn an ALJ's credibility determination unless it is patently wrong." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citations and

---

[3] For depression, the ALJ indicated that a rating of ten meant that "the depression's so bad you just want to crawl into bed, pull the sheet over your head, tell the world, 'Go away, leave me alone forever.'" [R. at 52.] For anxiety, the ALJ indicated that a rating of ten meant "the anxiety is so bad you lose personal control." [R. at 57.]

6

quotation marks omitted). The ALJ, however, must still "justify the credibility finding with specific reasons supported by the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The ALJ in this case listed and then considered the factors outlined above, [R. at 27-28], but his analysis of each factor was flawed.

The ALJ first stated that he must consider the "nature, location, duration, frequency, and intensity of the claimant's symptoms." [R. at 28.] Rather than doing so, however, the ALJ immediately turned to the type of treatment that Plaintiff had sought and received. [*Id.*] Here, he wrote that Plaintiff "has not generally received the type of medical treatment one would expect" for someone with Plaintiff's alleged symptoms. [*Id.*] He specifically noted that Plaintiff had "been to a mental health center only four times" and that he had received only "conservative" treatment because his mental illnesses were treated only with medication. [*Id.*]

This characterization improperly minimizes Plaintiff's treatment. Even if Plaintiff visited a "mental health center" only four times, Plaintiff sought treatment for his depression from other health care providers on a much more frequent basis. [*See, e.g.*, R. at 348 (December 5, 2012 appointment to discuss depression with nurse Wysong); R. at 356 (August 7, 2012 appointment with nurse Wysong); R. at 359 (April 9, 2012 appointment to adjust medication for depression); R. at 363 (March 2, 2012 appointment to discuss depression); *see also* R. at 60 (noting that Plaintiff saw nurse Wysong "every three months").] In addition, nurse Wysong's treatment notes indicate that Plaintiff underwent counseling for depression. [R. at 363 ("[Patient] has been seeing a therapist for depression"); R. at 359 ("Patient is seeing a counselor at Centerstone [Mental Health Center].").] These notes belie the ALJ's statement that Plaintiff sought only medication for his condition, and they suggest that Plaintiff sought ongoing, repetitive treatment for his

impairment. At such, it was inaccurate for the ALJ to imply that Plaintiff's treatment was merely sporadic.

Next, the ALJ exaggerated the effect of Plaintiff's medication. He wrote that Plaintiff's symptoms were "mild and under control" and stated that "medications have been relatively effective in controlling the claimant's symptoms." [R. at 28.] Certain treatment records support this statement. [*See, e.g.*, R. at 359 (noting that symptoms are "fairly controlled").] These same treatment notes, however, indicate that even when the symptoms were "controlled," Plaintiff still reported that daily "functioning [was] somewhat difficult." [*Id.*; *see also* R. at 348 (same).] Additionally, treatment notes show that Plaintiff sought different medications that would produce less severe side effects or that would better control his depression. [R. at 359 (noting that Plaintiff "was put on Cymbalta, but he does not like the way it makes him feel and he feels it does not help with his depression any better than the [C]elxa did").] Finally, even while on medication, Plaintiff sought additional treatment. [*See, e.g.*, R. at 320 (noting that Plaintiff "wants to continue in therapy").] Thus, even if Plaintiff's symptoms were at times "fairly controlled," they were evidently not controlled to such a degree that he could effectively function or that he was content with his treatment. This, in turn, suggests that Plaintiff's treatment history was in fact consistent with his allegations of disabling impairments. *See, e.g.*, *Schmidt v. Colvin*, 545 F. App'x 552, 556 (7th Cir. 2013) (finding that claimant's complaints were credible where claimant had sought different kinds of treatment and had used a variety of medications).

The ALJ next discussed "precipitating and aggravating" factors and measures other than treatment or medication that Plaintiff used to alleviate his symptoms. [R. at 28.] The ALJ noted that Plaintiff reported that "being around other people causes [Plaintiff] to get frustrated," [R. at 28], and that Plaintiff coped with this difficulty by "go[ing] shopping . . . at night so that there

8

are [fewer] people in the store." [R. at 29.] Dr. Poupeney's examination notes confirmed these complaints, as she noted that Plaintiff stated that he "experiences chest pain, feels smothered, and experience[s] nausea" when in crowded areas. [R. at 278.] Dr. Poupeney thus stated that Plaintiff "may struggle in employment that requires frequent interactions with people that he is not familiar with." [R. at 279.]

The ALJ wrote that Plaintiff's reports helped "confirm[] the existence of many impairments and functional limitations," [R. at 29], and he added that "[t]hese matters have been taken into account in assessing [Plaintiff's] residual functional capacity." [R. at 28.] Nonetheless, the ALJ's RFC analysis specifically stated that Plaintiff "can have frequent contact with the general public." [R. at 27.] Thus, even if the ALJ claimed that he addressed the above-noted limitations on Plaintiff's functioning, his ultimate RFC analysis still exposed Plaintiff to the same social situations that were the source of Plaintiff's anxiety.

Next, the ALJ improperly evaluated Plaintiff's daily activities. He noted that Plaintiff "does not have problems caring for his personal needs;" that he "is able to prepare simple meals;" that he "does not perform any household chores but he does mow the yard;" and that he "spends the remainder of his time watching television." [R. at 29.] As an initial matter, it is not at all clear why performing such basic activities indicates that Plaintiff does not have serious functional limitations. *See, e.g.*, *Mueller v. Astrue*, 493 F. App'x 772, 774, 777 (7th Cir. 2012) ("At home, Mueller said, he mows the lawn and picks up after himself and mainly sits around watching eight to nine hours of television a day. . . . [I]t is certainly not obvious how the very minimal activities Mueller described contradict a claim of a disabling mental disorder."). In addition, the ALJ himself noted that Plaintiff is able to perform these activities only "*on the days that he gets out of bed*." [R. at 25 (emphasis added); *see also* R. at 29 (same).] Plaintiff's daily

9

activities thus hardly indicate that he can work full time; instead, they show only that—on his best days—he is capable of performing a markedly limited range of simple tasks. His activities are therefore not inconsistent with his complaints of a disabling mental disorder, and his daily activities thus do not undercut his credibility.

Finally, the ALJ erred in evaluating the objective evidence supporting Plaintiff's complaints. When evaluating a claimant's ability to work, the SSA considers "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "Objective medical evidence" means "medical signs and laboratory findings as defined in § 404.1528 (b) and (c)." *Id.* Those subsections, in turn, define "medical signs" to include "abnormalities of behavior, mood, thought, memory, orientation, development, or perception" that can be "shown by observable facts" and that can be "medically described and evaluated." 20 C.F.R. § 404.1528(b).

In this case, the ALJ found that Plaintiff was not credible because his allegations could "not be objectively verified" by "medical evidence." [R. at 30; *see also* R. at 27 (noting alleged symptoms are not "consistent with the medical evidence); R. at 28 (finding "inadequate credible evidence of symptoms").] This conclusion, however, is problematic for multiple reasons. First, the Seventh Circuit has recognized that "[p]ain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). It was therefore erroneous to discount Plaintiff's complaints on the basis of an alleged lack of objective verification. *Accord* SSR 96-7P ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").

Next, the record in this case *did* contain objective evidence of mental impairments. First, medical professionals diagnosed Plaintiff with depression on multiple occasions. [R. at 279 ("Major Depressive Disorder"); R. at 321-23 ("Major Depressive Disorder, Recurrent, Moderate"); R. at 348, 356, 361, 363 ("Depression").] These diagnoses establish that "objective medical evidence" did in fact support Plaintiff's complaints about his depression. *See, e.g.*, *Monroe v. Astrue*, No. 09-C-1163, 2011 WL 854058, at *2 (E.D. Wis. Mar. 9, 2011) (quoting *Ramey v. Astrue*, 319 Fed. Appx. 426, 429, 2009 WL 899779, *3 (7th Cir.2009)) ("Depression, diagnosed by a medical professional, is objective medical evidence . . . to the same extent as an X-ray film."); *see also id.* (emphasis original) ("[A] diagnosis by a psychiatrist . . . *is* the objective evidence of mental illness."); *accord, e.g.*, *Bilby v. Schweiker*, 762 F.2d 716, 719 (9th Cir. 1985) (citation and alteration omitted) ("Disability may be proved by medically-acceptable clinical diagnoses, as well as by objective laboratory findings.").[4]

In addition, Plaintiff's diagnoses were accompanied "by observable facts" that were "medically described and evaluated." 20 C.F.R. § 404.1528(b). Nurse Wysong, for instance, noted that Plaintiff at times "present[ed] with depressed mood and fatigue," [R. at 359], or "present[ed] with anxious/fearful thoughts, depressed mood . . . diminished interest or pleasure and excessive worry." [R. at 359.] Other treatment providers characterized Plaintiff's depression as "severe," [R. at 329], corresponding to an impairment that "prevent[s] any participation in school/work, social settings, or family life." [R. at 322, 329.] They also noted that Plaintiff presented with an "anxious and depressed" mood and a "restricted" affect. [R. at 333.] Based on

---

[4] The Court acknowledges that a diagnosis—standing alone—does not establish that a claimant is disabled. *See, e.g.*, *Stanley v. Astrue*, No. 1:11-CV-00248, 2012 WL 1158630, at *11 n.8 (N.D. Ind. Apr. 6, 2012) ("[T]he diagnosis of an impairment does not alone establish its severity and its resulting limitations."). As described elsewhere in this opinion, however, the record contained evidence from Dr. Poupeney, from nurse Wysong, and from Ms. Hauer, all of which indicated that Plaintiff's impairments caused functional limitations that would prevent him from working.

these observations, the record did in fact contain "medical signs" that were consistent with Plaintiff's allegations of depression, and it was thus erroneous for the ALJ to conclude that Plaintiff's complaints lacked objective medical support.

For all these reasons, the ALJ's evaluation of Plaintiff's credibility was flawed. The ALJ may have discussed the appropriate factors for evaluating a claimant's credibility, but the evidence in the record is simply inconsistent with the ALJ's conclusions. The ALJ therefore failed to justify his credibility finding "with specific reasons supported by the record," *Terry*, 580 F.3d at 477, and his decision to discount Plaintiff's statements was erroneous.

### 2. Dr. Poupeney's Opinion

As noted above, the ALJ gave "little weight" to Dr. Poupeney's conclusion that Plaintiff's depression would prevent Plaintiff from working. [R. at 31.] The ALJ did so 1) because Dr. Poupeney "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant" and 2) because Plaintiff demonstrated a "cooperative" and "appropriate" mood during Dr. Poupeney's examination. [*Id.*]

The first rationale was erroneous. As explained above, the ALJ erred in discounting Plaintiff's statements about the impact of his depression. By discounting Dr. Poupeney's opinion because it was based on Plaintiff's statements, the ALJ merely compounded the original error in discounting Plaintiff's statements.

The second rationale is also erroneous. Although a doctor's observations during an exam are relevant evidence that an ALJ should consider, *see* 20 C.F.R. § 404.1527, the ALJ in this case failed to recognize the limitations of Dr. Poupeney's examination. "As the Seventh Circuit has repeatedly explained, 'a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition.'" *Fuchs*

12

*v. Astrue*, 873 F. Supp. 2d 959, 972 (N.D. Ill. 2012) (quoting *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).[5] Hence, even if Plaintiff displayed a "cooperative" and "appropriate" mood during Dr. Poupeney's examination, this single encounter says little about the long-term effect of Plaintiff's depression. The ALJ thus erred in using this isolated observation to determine that Dr. Poupeney's ultimate conclusions were entitled to little weight.

### 3. Third Party Opinions

The ALJ found the functional reports from claimant's mother and friend to be "partially credible." [R. at 30-31.] He discounted these statements for two reasons. First, he stated that the reports were "not supported by the medical evidence." [R. at 31.] Second, he stated that bias was inevitable because Plaintiff had a close personal relationship with the third parties and because one of the witnesses lived with Plaintiff and thus stood to financially benefit if Plaintiff received disability benefits. [*Id.*]

As with the ALJ's evaluation of Dr. Poupeney's report, the first rationale is erroneous. The record, as described above, contained numerous diagnoses and observations from medical sources confirming that Plaintiff suffered from depression. The third parties' statements that this depression impaired Plaintiffs' functioning, [*see* R. at 184-86; R. at 209-10], were thus not inconsistent with the medical evidence.

The second rationale—potential bias—is an appropriate factor to consider when evaluating reports from third parties. *See, e.g.*, *Varner v. Colvin*, No. 2:12-CV-485-PRC, 2014 WL 1152947, at *13 (N.D. Ind. Mar. 20, 2014) (citing SSR 06-03p). Bias alone, however, is an

---

[5] This is especially true where, as here, the illness at issue is recurrent depression and the claimant is being treated with prescription medication. *See Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010) (citation omitted) ("More importantly, symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression. 'A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days.'").

insufficient basis on which to reject such third-party reports. *Natt v. Colvin*, No. 2:14-CV-81-JEM, 2015 WL 1418792, at *9 (N.D. Ind. Mar. 27, 2015) (citing *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013)). In addition, an ALJ evaluating the credibility of a third party should generally explain the effect of perceived bias. *See Garcia*, 741 F.3d at 761 ("The administrative law judge should have made clear whether he believed the fiancée's testimony or not, or which part he believed, or whether he had no idea how much of what she said was worthy of belief."). The ALJ in this case stated only that the third parties were "partially credible." [R. at 31.] He did not further explain which parts of their reports he accepted or rejected, and so the Court cannot conclude that substantial evidence supports the ALJ's evaluation of these reports. *Accord Varner*, 2014 WL 1152947, at *13 ("[I]t is troubling that the ALJ does not specify which parts of Ms. Varner's mother's testimony to which he gives some weight. . . . On remand, the ALJ shall explain which of Ms. Varner's statements he credits.").

For these reasons, the ALJ erred 1) in evaluating Plaintiff's credibility; 2) in analyzing the opinion of Dr. Poupeney; and 3) in evaluating the third-party functional reports. In addition, the Court cannot say that these errors were harmless: Dr. Poupeney specifically stated that Plaintiff's depression would prevent him from working, [R. at 279], and the vocational expert testified at the hearing that the functional limitations Plaintiff described would interfere with Plaintiff's ability to maintain employment. [R. at 84.] Crediting the opinion of Dr. Poupeney or the testimony from Plaintiff thus could have easily changed the ALJ's ultimate finding that Plaintiff was not disabled, such that remand is necessary to correct the deficiencies in the ALJ's opinion. On remand, the ALJ must reevaluate Plaintiff's credibility and, in particular, the ALJ should not discount Plaintiff's complaints on the basis of an alleged lack of objective medical

support. The ALJ should also reevaluate Dr. Poupeney's opinion and the third-party functional reports in light of his revised credibility determination.

### B. Opinions of Beverly Hauer and Vicki Wysong

Social worker Beverly Hauer completed a Mental Residual Functional Capacity Questionnaire and indicated that Plaintiff was "unable to meet competitive standards" in a variety of work-related functional areas. [R. at 32 (citing R. at 341-45).] Nurse practitioner Vicki Wysong completed the same form and concluded that Plaintiff had similar limitations on work-related functions. [*Id.* (citing R. at 400-04).] The ALJ gave "no particular weight" to these opinions. [R. at 32-33.]

The SSA's regulations and rulings set out the procedures for evaluating opinions from social workers and nurse practitioners. Under these rules, sources such as physicians and psychiatrists are considered "acceptable medical sources," whereas sources such as social workers and nurses are considered "other" medical sources. 20 C.F.R. § 404.1513. Opinions from such "other" sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p. The ALJ should evaluate these opinions using the same factors used to evaluate opinions from "acceptable" medical sources. *Id.* He should therefore consider the nature of the source's relationship to the claimant; the consistency of the opinion with the rest of the record; the degree to which the source has explained and supported the opinion; whether the source has a particular specialty; and whether any other factors tend to support or refute the opinion. *Id.* The ALJ need not explicitly discuss each of these factors, *see, e.g.*, *Green v. Colvin*, No. 1:12-CV-176-JEM, 2013 WL 5320270, at *6 (N.D. Ind. Sept. 20, 2013), but the ALJ must "evaluate the record fairly" and "may not ignore an entire line of evidence that is contrary to his ruling."

15

*Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *see also Herron*, 19 F.3d at 333 (emphasis added) (requiring "consideration of *all* the relevant evidence")

The ALJ in this case discounted the opinions of Ms. Hauer and nurse Wysong 1) because they were "other" sources, rather than "acceptable" medical sources; and 2) because they presented their conclusions in the form of "summary 'check the block'" forms with little support. [R. at 31-32.] As described above, these are appropriate considerations in evaluating opinions from medical sources. *See* SSR 06-03p.

Other factors, however, supported Ms. Hauer's and nurse Wysong's opinions. First, both opinions were consistent 1) with Plaintiff's complaints about his disabling impairments; 2) with Dr. Poupeney's conclusion that Plaintiff's depression would prevent him from working; and 3) with the third-party functional reports that indicated Plaintiff had trouble interacting with others. [*See* R. at 341-45, 401-04.] Although the ALJ discounted these reports, the decision to do so—as discussed above—was erroneous, such that the consistency between Ms. Hauer's opinion, nurse Wyson's opinion, and the other statements in the record weighs in favor of crediting these opinions. *See* SSR 06-03p (directing ALJ to consider "[h]ow consistent the opinion is with other evidence"). Second, Plaintiff testified that he had been seeing nurse Wysong "every three months" for thirteen or fourteen years. [R. at 60.] Nurse Wysong thus had an extensive history and familiarity with Plaintiff that would have entitled her opinion to greater weight. *See* SSR 06-03p (directing ALJ to consider "[h]ow long the source has known and how frequently the source has seen the individual").

The ALJ did not discuss these factors. [*See* R. at 32-33.] Moreover, even if he had, his consideration would doubtless have been colored by the earlier-discussed decision to erroneously discount the weight given to the other evidence in the record. The Court therefore cannot say that

16

the ALJ "evaluate[d] the record fairly." *Golembiewski*, 322 F.3d at 917. Thus, on remand, the ALJ should reconsider the reports from Ms. Hauer and nurse Wysong. The ALJ should be especially mindful that the reports from Ms. Hauer and nurse Wysong—as noted above—are consistent with the other reports of Plaintiff's limited functioning.

### C. Updated Medical Opinion on Equivalence

Plaintiff finally contends that the ALJ erred in not seeking an updated medical opinion on whether Plaintiff's impairments met or medically equaled a Listed impairment. The equivalence determination is ultimately reserved to the Commissioner, but "longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p; *see also Honeysucker v. Bowen*, 649 F. Supp. 1155, 1158-59 (N.D. Ill. 1986) ("The question of whether a claimant's impairment is equivalent to a listing, even though it does not precisely match that listing, is a medical question. At least where the evidence fairly raises the question, a medical expert should evaluate it.").

Submission of Disability Determination and Transmittal forms satisfy the requirement of a medical opinion, as these forms "conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citation and internal quotations omitted). After such forms are submitted, an ALJ is required to obtain an updated opinion only 1) if "in the opinion of [ALJ] the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable" or 2) if "additional medical evidence is received that in the opinion of the

17

[ALJ] may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." SSR 96-6p.

In this case, the record contains Disability Determination and Transmittal forms indicating that physicians assessed whether Plaintiff's "affective disorder" or "anxiety related disorder" rendered Plaintiff disabled. [R. at 87-88.] These forms satisfy the requirement for a medical evaluation of equivalence, *see Scheck*, 357 F.3d at 700, but Plaintiff argues that an updated opinion was necessary because the doctors who completed these forms did not evaluate the functional reports submitted by Ms. Hauer and nurse Wysong. [Dkt. 14 at 15.]

As the SSA's ruling makes clear, the ALJ has significant discretion in determining whether to obtain an updated medical opinion. *See* SSR 96-6p (emphasis added) (requiring update only if necessary "*in the opinion of the [ALJ]*"). In this case, however, the ALJ's determination that no update was necessary was apparently based at least in part on his decision to afford "no particular weight," [R. at 30-31], to the functional reports submitted by Ms. Hauer and nurse Wysong. As described above, the ALJ on remand must reevaluate the weight given to these reports. If, after doing so, the ALJ believes that these reports "may [have] change[d] the State agency . . . consultant's findings" on equivalence, then the ALJ should summon a medical expert to obtain an updated medical opinion. *See* SSR 96-6p

Plaintiff also contends that the ALJ should have obtained a medical opinion on whether Plaintiff's back impairment met or medically equaled Listing 1.04. [Dkt. 14 at 14.] This Listing requires a spinal disorder such as degenerative disc disease in addition to other criteria such as limitation of motion of the spine, spinal arachnoiditis, or lumbar spinal stenosis. 20 C.F.R. § Pt. 404, Subpt. P, App. 1. As Plaintiff notes, the ALJ found that Plaintiff did in fact suffer from

degenerative disc disease, [R. at 20], and treatment notes indicate that Plaintiff had other symptoms that may have satisfied the remaining criteria of Listing 1.04. [*See, e.g.*, R. at 350 ("Decreased [range of motion] of lumbar spine"); R. at 370 ("Limited mobility of lumbar spine").] The evidence in the record thus "fairly raise[d] the question" of equivalence, such that any equivalence determination should have been based on a medical opinion. *Honeysucker*, 649 F. Supp. at 1158.

In this case, however, the Disability Determination and Transmittal forms addressed only Plaintiff's mental impairments, [*see* R. at 87-88], and Plaintiff underwent only a psychological—rather than a physical—consultative examination. [*See* Dkt. 12-1 (Index of Administrative Record).] The record therefore contained no opinion from a "physician (or psychologist) designated by the Commissioner on the issue of equivalence" of Plaintiff's back impairment. SSR 96-6p. As a result, the ALJ should have obtained such a medical opinion, and on remand, the ALJ must do so. *See Honeysucker*, 649 F. Supp. at 1158; *accord Allen v. Astrue*, No. 1:11-CV-01485-JMS, 2012 WL 6094169, at *5 (S.D. Ind. Dec. 7, 2012) ("[T]he record suggests that a judgment of equivalency might have been reasonable, requiring the ALJ to obtain a medical expert's opinion under SSR 96–6p. This is especially true in cases such as this, where there is no sufficient state medical evaluation. . . . Therefore, this matter should be remanded in order to obtain an expert medical opinion[.]").

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence does not support the ALJ's determination that Noble was not disabled, and the Magistrate Judge recommends that the Commissioner's decision be **REVERSED** and **REMANDED**. On remand, the ALJ should reevaluate Plaintiff's credibility and reassess the other evidence in the record in light of that

reevaluation. The ALJ should also obtain a medical opinion on whether Plaintiff's spinal impairment meets or medically equals Listing 1.04.

Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 04/20/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov